(No. 15190.—Rule made absolute.)
THE PEOPLE ex rel. Edward J. Brundage, Attorney General, Relator, vs. HERBERT D. BLAKEMORE, Respondent.

*Opinion filed October 20, 1923.*

1. PRACTICE—*original proceeding in Supreme Court should be presented by printed abstract as in case of an appeal.* An original proceeding on information in the Supreme Court should be presented by an abstract or printed papers containing all matters of record necessary for the decision of the issues presented, the same as in case of an appeal.

2. DISBARMENT—*attorney will be disbarred for attempting to enforce claim by blackmail.* An attorney occupies a fiduciary relationship both to the court and to his clients, and where he uses his profession and his connection with a newspaper to enforce the collection of a disputed claim by blackmail he will be disbarred.

INFORMATION to disbar.

EDWARD J. BRUNDAGE, Attorney General, (JOHN L. FOGLE, of counsel,) for relator.

JAMES H. ANDREWS, for respondent.

Mr. JUSTICE CARTER delivered the opinion of the court:

This was an information instituted by the People, on the relation of the Attorney General, against the respondent, Herbert D. Blakemore, asking that he be disbarred from the practice of law. The matter was referred to a commissioner, who heard the testimony and reported the same, together with the finding that the course of action pursued by the respondent was unprofessional and dishonorable and denoted a lack of good moral character and was calculated to bring the courts of justice into disrepute and to tarnish the good name and fame of the legal profession, and that he had been guilty of malfeasance in his office as an attorney of this court. The respondent filed objections to the commissioner's report, which were overruled, and

they are filed in this court as exceptions. The cause is now before this court on the findings of the commissioner, the exceptions of the respondent and the evidence taken before the commissioner.

This court has frequently said that "everything necessary to a decision of questions raised by an appeal must appear in the abstract." (*City of Mt. Carmel* v. *McClung*, 269 Ill. 450.) The proceeding here is an original one upon information in this court. However, a similar principle should apply as in the case of an appeal. Printed papers in lieu of an abstract should contain all matters necessary for the decision of the issues presented. In this case it has been necessary to resort to the record for the text of the information and for the articles upon which the information is based. The court would be much convenienced by having these documents presented in the printed papers submitted to the court, rather than have the burden of resorting to the record for documents necessary in order to decide the case.

The respondent, Herbert D. Blakemore, was admitted by this court to practice as an attorney in 1883. According to his brief he did not engage in active practice from 1885 to 1920 but resumed practice at Rock Island on the last mentioned date and has continued to practice there ever since. The substance of the charge is, that the respondent, having a claim against a corporation and having access to the columns of a newspaper, threatened to use, and did use, the columns of that newspaper for the purpose of attacking the persons against whom he had the claim, in order to enforce the payment of the claim by blackmail. The facts and circumstances in support of this charge, as established by the evidence and by the admissions of the respondent, are as follows:

The respondent had a claim against the Plow City Oil and Gas Company for moneys advanced and promotional services rendered such company. This company had appar-

ently entered into a transaction with the Texas Eureka Oil and Refining Corporation by which the latter was to take over certain property and obligations of the Plow City Company, the transaction in this connection having been handled through Harry E. Haley, of Chicago. On September 22, 1919, the respondent wrote a letter addressed to Haley and to George R. Smith, of Geneseo, one of the directors and secretary and treasurer of the Plow City Company. With this letter he enclosed a statement which he said would appear in the *Rock Island News* on October 4, setting forth matters derogatory to the Texas Eureka Company and to its transactions in connection with oil stock brokerage and the sale of oil stock. It is admitted that the proposed article so enclosed was written by the respondent and appeared in the issue of the *Rock Island News* for October 11, 1919, and that two additional articles of much the same character, written by the respondent, appeared in the same newspaper under dates of October 18 and October 25, 1919. It is also admitted that the respondent wrote and mailed the following letter to Joseph Shaw on November 13, 1919, who in some manner represented Smith and the Plow City Company:

"ROCK ISLAND, ILL., *Nov. 13, 1919.*
*Joseph Shaw, Esq., Attorney at Law, Geneseo, Ill.:*

"DEAR SIR—I suppose you are aware that the contract of sale between the Plow City and Haley, representing the Texas Eureka, fixing the amount to be paid me, is conclusive and binding upon the Plow City. The purpose of securing a resolution of approval was simply to get my judgment at once, as the contract could not be availed of except upon a trial. But so much for that. If Brown demands a trial the case cannot come up until January, but we will be on hand then with enough evidence, aside from the admission of the Plow City as contained in this contract, to secure a judgment for the entire amount of my claim.

"But the main purpose of my writing you is to advise you that the columns of the *Rock Island News* have been placed at my disposal, to use as often and as much as I please. I have been absent from Rock Island for about three weeks, except one day in Moline to attend the directors' meeting, and have, in consequence, missed

out as to one or two issues of the paper. I do not know whether the article prepared for this week will get in or not. I am rather inclined to think it was sent too late for insertion before the forms closed. But from now on every issue of the paper will contain as severe a lambasting of the Texas Eureka and the gang of Henry county and Chicago as I am able to indite. And this will be kept up,—a continual hammering of the company until it is completely on the rocks. Up to date I have contented myself with putting the hooks into the company and its officers, and for several more issues I will continue doing so, as I have material for a number of articles showing up Carlin and Haley. Of course, their coadjutors, the directors of the Texas Eureka, will not be disturbed by these articles because they happen to be rather deep in the mire themselves, but there are the stockholders of the Grayson, whose notes to the *News* called out by spiels shows that they are thinking a thunk, and it is the expectation of the writer that some of them may be impelled by the frauds practiced upon them to bring court proceedings against the gang. An offer of this kind is likely to be made in the near future in the *News,* with agreement to furnish counsel free to anyone who desires to secure a show for his white alley.

"As I say, I have confined my attack heretofore simply upon the demerits of the Texas Eureka and the gang controlling the same and the Grayson. I am gathering new data relative to the several directors and their plunging, reckless methods of doing business. This information is coming to me unsolicited, showing that the opinion I have of them is shared by their neighbors. I propose at the proper time to unfold something of the peculiarities of the secretary of the Texas Eureka, George R. Smith, along moral lines. I refer to certain episodes which Smith himself told me; one during the present year with a woman of loose habits at the Mercer Hotel, in Kansas City; another with a naked woman in a sleeper coming from Sioux City; and a third in a sleeper coming from Minneapolis. I think if these things were written up at length, say a two-column article, and appear once a week for three successive weeks, or perhaps once every two weeks to extend the time they appear, they might prove attractive reading for his family and the people of Geneseo. Smith knows what I refer to, and I will simply tell the truth about them as he told me. But whether the people generally will believe his statements is an entirely different matter. I will simply repeat what he said to me as to these matters. I write so that you may advise Smith just what is coming in the near future.

"I am sorry that matters have gotten into such a mess, but since Smith and his gang have thrown down the gauntlet I will use the most formidable weapon I have, and keep hammering away at

both the company and the bunch controlling it until the company will be but a memory and the gang forever discredited in the community. As to the latter statement, the communications coming into the *News* office demonstrate that the few temperate articles written thus far have accomplished much more towards the destruction of the Texas Eureka and the disillusionment of the duped stockholders of the Grayson than I had any idea would result in so short a time.

"You will pardon so long a letter. It seemed to me necessary to explain my position and the course of my conduct in the future.

"Yours truly,    H. D. BLAKEMORE."

Several days after writing this letter Blakemore had a conference with Shaw in the latter's office at Geneseo, and Shaw testifies this conference was at Blakemore's request; that no one was present at this conference, and that he and Blakemore discussed Blakemore's claim against the Plow City Company, and that Blakemore said that he intended to publish in the *Rock Island News* the material set out in the letter of November 13 unless his claim was allowed by the company without further contest. According to Shaw's testimony, Blakemore asked that the letter of November 13 be shown to Smith. Shaw's statement is in no way weakened by the testimony of Harry E. Brown, to the effect that several months after the conference he and Shaw had a conversation about the matter, in which Shaw stated that Blakemore had written a letter threatening to publish certain articles derogatory to Smith unless his claim was adjusted. According to Blakemore, the conversation with Shaw regarding Blakemore's claim was introduced by Shaw, and he (Blakemore) until that time had no knowledge that Shaw was one of the counsel for the Plow City Company in connection with this claim. Shaw's account of the conference is, however, supported by his letter of November 20, which is admitted by both parties, the body of which is as follows: "With reference to your letter of November 13 and our conversation of yesterday at my office, I have laid the matter fully before Mr. Smith. He

feels that your present claim is unjust and is unwilling that you should receive more than the court will allow in your attachment suit. So far as your proposed campaign in the *Rock Island News* is concerned, he feels that as it has no bearing upon the merits of your claim against the Plow City Company he cannot consider it. He has, however, requested me to turn over your letter to the post-office authorities." Following the letter of November 13, the conference, and the letter of November 20 just referred to, articles were published in the *Rock Island News* under date of November 29 and December 13, somewhat similar in context to Blakemore's letter of November 13. The article of December 13 contained the following statement, among others: "Have the people of Geneseo noticed the spic and span new suit of clothes George R. Smith has been sporting round in these latter days? As hard up all summer as a church mouse, he has lately appeared in a brilliant suit of clothes bought with some of the graft he secured by discounting one of John H. Smith's notes. And it has also been noted that while a few months back money was scarce with him, he has lately been as flush as the lucky man in a poker game. And George R. don't gamble. Oh, no! But it is a pity George did not have this nifty suit on when he was at the disreputable Mercer Hotel, in Kansas City, last spring, and had some association with a woman of slack morals as well as dress, as he himself told. But this episode will be reserved for a future article. And remember, we will only relate what Smith himself related,—nothing more." Blakemore denies the authorship of these articles, but Dan Drost, at that time in the management of the *Rock Island News,* testified that Blakemore wrote the articles. Blakemore seeks to rebut Drost's testimony by presenting testimony of employees of the *Rock Island News* who apparently know little about the articles and their authorship, and the testimony of another witness to the effect that two or three years prior to this transaction Drost could not read or write.

As against the evidence and circumstances above recited, Blakemore's explanation is that he wrote the earlier articles for the *Rock Island News* in order to protect the public from a swindle, and that he had nothing to do with the later articles which contained the personal attack upon Smith and the threat of further personal attacks. His further explanation is that he wrote the letter of November 13 because of attacks made upon him by Smith and Smith's associates, and with no intention of carrying out the threats contained in that letter. Even if the letter of November 13 stood alone, this explanation of Blakemore seems to us improbable and unreasonable, but the other proven facts in the record and the facts admitted by Blakemore clearly fit into the view that he wrote this letter as a part of a scheme to force the collection of a claim in his favor. The whole transaction appears to us to be highly discreditable and damaging. All the facts combine to show low ethical standards, and to indicate the impropriety of an attorney at law, whether in active practice or not, engaging in such a scheme of oil stock promotion and of journalistic endeavor. The combination of occupation and profession in the manner shown in this case was highly improper and not in accordance with the ethics of the legal profession. An attorney occupies a fiduciary relationship both to the court and to his clients, and special confidence is reposed in him because he bears the certificate of this court that he is of good moral character and worthy to be entrusted with the interests, business and property of those who require his services. In the discharge of its duty to the public this court cannot permit the name of Herbert D. Blakemore to remain on its roll of attorneys as a proper person to be entrusted with the interests of persons needing legal services requiring honesty and freedom from moral delinquency.

The rule is made absolute, and the name of the respondent will be stricken from the roll of attorneys of this court.

*Rule made absolute.*